**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION**

IN RE:

**CLASSICSTAR, LLC**

                                        **CASE NO. 07-51786**

**DEBTORS**


**JAMES D. LYON, CHAPTER 7 TRUSTEE
OF CLASSICSTAR, LLC**                                                          **PLAINTIFF**

**VS:**                                                                                            **ADV. NO. 09-5155**

**NEIL BAKER**                                                                            **DEFENDANT**


**MEMORANDUM OPINION**

This Court, having conducted a trial of this proceeding on January 11, 2011 [Doc. 108], and having reviewed all pleadings in the record of the matter, considered all evidence presented by affidavit and exhibits, and being otherwise sufficiently advised, hereby makes the following findings of fact and conclusions of law:

**FINDINGS OF FACT**

The Debtor filed its voluntary Chapter 11 bankruptcy petition on September 14, 2007 (the "Petition Date"). On April 14, 2008, the Debtor's Chapter 11 case was converted to a Chapter 7. James D. Lyon was appointed to serve as the Trustee for the Debtor's estate.

The Debtor's business consisted of operating a "Mare Lease Program." Under this program, the Debtor would sell to an investor an interest in the breeding rights of a thoroughbred mare for one breeding season. Investors would generally have the right to any resulting offspring. Investors would purchase mare leases to take advantage of certain tax benefits that were purportedly available as a result of the investment.

The Defendant Neil Baker ("Baker") and his wife became interested in investing with the

Debtor sometime in 2003.  After conducting some initial research into the Debtor, Baker executed a letter of intent with the Debtor on or about September 3, 2003.  The letter of intent reflects a total investment of $1,571,032.00, financed by Baker as follows: (I) a loan from Nebann Group, LLLP(of which Baker was a shareholder) in the amount of $161,516.00; (ii) an additional down payment check for $10,000.00 from Nebann Group, LLLP, (iii) a loan from Key Bank in the amount of $786,516.00 ("Key Bank Loan"); and, (iv) a loan from the National Equine Lending Company, L.C. in the amount of $624,000.00.

Baker's initial investment with the Debtor was memorialized in a Mare Lease and Breeding Agreement, with an attached Schedule A listing the pairings, as well as a Boarding Agreement, Foal Agreement and Nominee Agreement (collectively the "Mare Lease Agreements").  The Mare Lease Agreements set forth a payment of $1,040,000.00 in "rent" for a term of seven months beginning December 2, 2003, and terminating July 1, 2004, with mares expected to produce foals in the year 2005.  In addition to the $1,040,000.00 in "rent," Baker also paid: (1) $176,200.00 for stallion service fees; (2) $204,832.00 for prospective foal insurance fees; and (3) $150,000.00 for boarding fees to the Debtor, for the total initial investment of $1,571,032.00.  The Mare Lease Agreements further contemplated that at the end of lease period, Baker would retain ownership of any foals produced as a result of the pairings, although the Mare Lease Agreements did not guarantee the birth of live foals.  Having arranged all the financing in 2003, Baker finally signed the Mare Lease Agreements on January 12, 2004.

Almost immediately after becoming part of the program, Baker began considering ways of maximizing his investment by converting his equine interests into other forms of investments. The Debtor began sending Baker illustrations of proposals of ways in which he could sell and/or diversify his interest in the Mare Lease Program.  As demonstrated by numerous scenarios of conversion, Baker reviewed and considered a variety of illustrations of how to increase and

2

capture additional profits by converting his mare lease interest into other investments (collectively "Illustrations"). Some Illustrations offered 100% conversion of equine interests, some offered an opportunity to keep some of the prospective foals, and some offered a combination of keeping the foals and selling them as 2-year olds to repay the outstanding loans that financed the participation fee and converting a portion of equine interests into stock or other investments that would increase in value over time.

As evidenced by Baker's correspondence with his financial advisor, the ability to leverage the mare lease participation fee against tax liability and secure a significant tax refund from the United States was very appealing to Baker. Indeed, the size of Baker's initial mare lease package is identical to the amount of Net Operating Loss needed to maximize Baker's tax refund. In 2003, Baker claimed the full amount of his farming loss/tax deduction in the amount of $1,587,990.00 which accounted for his full mare lease participation fee and interest charges. In 2004, Baker received a refund check from the United States Treasury in the amount of $430,252.00. Baker also claimed a deduction in the amount of $58,064.00 on his 2004 tax return in connection with his mare lease participation for interest expenses.

In early November 2004, the Internal Revenue Service announced and began its investigation into illegal tax shelter promoter activities of the Debtor's Mare Lease Program. Shortly thereafter, the IRS began auditing the mare lease participants and disallowing the tax deductions as well as assessing penalties for inaccurate representations to the IRS.

Also in November of 2004, Baker and the Debtor, through a series of conversations and emails, reached an oral agreement to diversify the Bakers' interests wherein the Bakers agreed to give up their rights to the prospective foals under the Mare Lease Program and the Debtor agreed to assume the Key Bank Loan, with any additional terms to be determined at a later date. At that time, Baker ceased making interest payments on the Key Bank Loan. The Debtor began making interest payments on the Key Bank Loan starting on January 31, 2005, and

continuing through the latter part of 2005.

On January 25, 2005, Baker received a Collateral Assignment and Security Agreement to be executed by Baker in favor of the Debtor. The Collateral Assignment and Security Agreement granted to the Debtor a security interest in collateral described as membership interests in First Equine Energy Partners, LLC ("FEEP Units"). Baker previously executed a similar security agreement with the Debtor wherein Baker granted the Debtor a security interest in all of Baker's mare lease interests as collateral to secure Baker's obligation on Key Bank Loan. This Collateral Assignment and Security Agreement stated that the Debtor was to ensure that any interest payments per the existing Key Bank Loan were to be paid in a timely fashion. The Collateral Assignment and Security Agreement was never signed by either Baker or a representative from the Debtor.

Despite the parties' oral agreement in November 2004, the Debtor continued to look to Baker for consent regarding the mare lease interests. On January 3, 2005, the Debtor advised Baker of a proposed change to the Schedule A of his equine interests by substituting a horse and soliciting Baker's approval for the substitution. Baker executed the consent to this substitution. On February 21, 2005, the Debtor requested Baker's permission to perform minor corrective surgery on any potential foals and provided Baker with a Foal Surgery Authorization Form. Baker consented and executed the authorization form allowing the Debtor to proceed with periostial elevation and transphyseal bridging surgeries on foals as necessary from "the period of time from birth to September 30, 2005." Furthermore, as a result of Baker's failure to make interest payments to Key Bank on the Key Bank Loan, Baker received overdue notices.

On April 5, 2005, Baker received via email the agreement setting forth the final terms of his conversion. The agreement contained terms to enable Baker to convert 100% of his mare lease interests into $929,269.00 of membership interest in FEEP Units with a put option at

$1.00 per unit and a promissory note of $641,763.00 from Geostar Financial Services Corporation (the "Geostar Note").[1] The Illustration appended to the April 5, 2005 e-mail setting forth these terms reflects the "horse interests" were sold to Geostar Financial for $641,763.00 and a "First Equine Stable Valuation $929,269 Loan Repayment ($785,516)." The total amount of consideration to be received by Baker as a result of this conversion was $1,571,032.00 – exactly the amount of Baker's mare lease participation fee.

The FEEP subscription document attached to the April 5, 2005 e-mail further contemplated that the Key Bank Loan would be repaid from the proceeds of the put once Baker exercised that option. The FEEP subscription documents state: "Whereas, the company is offering for sale Series A 9% Preferred Membership Units for a purchase price of $1.00 per Unit. . . " The Purchase Price is payable by tender of lease interests in equine bloodstock . . ." to FEEP.

On September 30, 2005, Baker executed and returned the documents included in the April 5, 2005 email. In his letter to the Debtor, Baker wrote

> These documents will be valid when I receive the returned signed documents which will include the Guaranty for the Installment Note that you sent with these documents.
>
> I also assume that First Equine Energy Partners, LLC or Geostar Financial Services Corporation will be responsible for interest and principle payments on our KeyBank loan.

There is no evidence in the record that the documents were ever signed and executed by the Debtor, Geostar Financial Services Corporation, or FEEP, or returned to Baker. In fact, Baker testified that he never received the GeoStar Note that was promised to him or the FEEP units.[2]

---

[1] At all relevant times after 2000, the Debtor was wholly owned by Geostar Corporation, a privately held company engaged in the business of gas and oil exploration and development. Geostar owned two companies, ClassicStar Farms, Inc. and Tartan Business, L.C., which in turn were the sole members and thus owners of the Debtor.

[2] On July 21, 2008, Baker filed a complaint in the United States District Court for the District of Colorado, seeking to recover damages from Geostar Financial Services Corporation and First Equine Energy Partners, LLC for breaches of the conversion agreements, namely the

5

On December 8, 2005, ClassicStar repaid Baker's Key Bank Loan in the amount of $801,558.70.  At the time of the payoff, the Debtor's records indicate that it was insolvent.  Paul Vidas, a forensic accountant and insolvency expert, testified that the Debtor's balance sheet on December 31, 2005 (the date closest to the date the Key Bank Loan was paid off) demonstrated that the Debtor had total assets in the amount of $81,609,456.09 and stated liabilities in the amount of $250,200,375.22 and stated and unstated liabilities in the amount of $371,068,484.67.  Mr. Vidas therefore concluded that under the balance sheet test, the Debtor was insolvent by not less than $168,590,919.30 (taking into account only stated liabilities) and $289,459,028.57 (accounting for unstated liabilities as well).  Baker offered no evidence or expert opinion to counter or otherwise rebut Mr. Vidas' findings.

Baker's tax deduction predicated on ClassicStar's mare lease participation eventually came under the IRS scrutiny and, by letter dated August 17, 2007, the IRS determined that Baker's claimed losses and deductions were improper and the IRS assessed additional taxes and penalties on Baker ("IRS Investigation Report").  The IRS Investigation Report also determined that the value of pairings listed on Schedule A of Baker's Mare Lease Agreements had value far below the mare lease participation fee.  Baker's only evidence to rebut the IRS valuation of his equine interests was his own testimony that the Debtor represented to him that the prospective foals would be worth at least his initial investment.

## Conclusions of Law

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H).

**A.    11 U.S.C. § 548(a)(1)(B)**

---

Geostar Note and a breach of a put agreement by First Energy Partners, LLC, to redeem Baker's FEEP Units.

Section 548(a)(1)(B) of the Bankruptcy Code permits the avoidance of any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within two years before the date of the filing of the petition, if the debtor, voluntarily or involuntarily:

> (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)
> > (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation...

11 U.S.C. § 548(a)(1)(B).  The Trustee bears the burden of proof of all elements of a fraudulent transfer by a preponderance of the evidence.  *In re Empire Interiors, Inc.*, 248 B.R. 305 (N.D. Ohio. 2000).  *See also Lackawanna Pants Mfg. Co. v. Wiseman*, 133 F.2d 482 (6th Cir. 1943).

**(1)    Transfer**

The transfer the Trustee seeks to avoid is the Debtor's payoff of Baker's Key Bank Loan. The evidence shows that this transfer occurred on December 8, 2005, when the Debtor transferred the funds to Key Bank.  The Debtor filed for Chapter 11 bankruptcy on September 14, 2007.  Thus the Trustee has shown that the transfer clearly falls within two years of the Petition Date as required by section 548(a)(1)(B).

**(2)    Reasonably Equivalent Value**

The determination as to whether a transfer is for reasonably equivalent value is a question of fact, and the Court must look to the circumstances surrounding the transfer.  *In re Vencom, Inc.*, 355 B.R. 3, 11 (Bankr. W. D. KY 2006).  "A court considering this question should first determine whether the debtor received any value in the exchange." *In re Wilkinson*, 196 Fed. Appx. 337, 343 (6th Cir. 2006).  "If so, the Court should determine if the value received was reasonably equivalent." *Id.*

The date for defining reasonably equivalent value is the date of the transfer.  *See In re*

7

*Morris Communications NC, Inc.*, 914 F.2d 458, 466 (4th Cir. 1990).  On December 8, 2005, the Debtor paid on Baker's behalf the Key Bank Loan in the amount of $801,558.70 and received no value in return.  Although the agreement negotiated between Baker and the Debtor may have been to exchange Baker's mare lease interests to the Debtor for payoff of the Key Bank Loan, the Geostar Note and FEEP units, there is no evidence in the record that this agreement was ever finalized and the mare lease interests ever formally transferred to the Debtor.  The agreement to pay off the Key Bank Loan made in November of 2004 is at best an oral agreement never executed by both Baker and representatives of the Debtor.  This is reflected not only by the lack of signed written documentation but also by the parties actions after the agreement was made in November of 2004.  The Debtor, while paying some interest payments on the Key Bank Loan, continued to treat Baker as the owner of the interests.  In addition, Key Bank continued to send Baker notices that he was overdue in his payment.  Baker even concedes that in November of 2004, the final terms of the agreement were not finalized at the time that the Debtor agreed to pay off the Key Bank Loan.  Thus, while Baker and the Debtor may have intended to enter into this agreement, they did not formally do so in November of 2004.

     It is Baker's position that the agreement was eventually finalized in September of 2005.  But the documents relied upon by Baker show only that Baker signed a Geostar Note; the Note does not contain the signature of any representative of the Debtor or Geostar.  In fact, Baker states in his cover letter that the documents will only be valid when he receives "the returned signed documents which will include the Guaranty for the Installment Note that you sent with these documents."  There is no evidence in the record that Baker ever received the documents signed by the Debtor, Geostar, or First Energy Equine Partners, LLC.  In fact, Baker admits that he never received the Geostar Note or the FEEP units promised to him by any of these entities.  It is apparent from the record that regardless of particulars of the agreement between Baker and

the Debtor, the agreement was never executed.

Baker argues that regardless of whether the agreement was finalized, the Debtor still received value from Baker's payment of $1,571,032.00 to the Debtor's business in 2003 because that investment created an antecedent debt owed to Baker by the Debtor. Baker argues that his investment created an obligation by the Debtor to either perform on the terms of the agreement or repay his money. Baker concludes that since the only return on his investment was the payoff of the Key Bank Loan, this payoff must be offset by his initial investment as an antecedent debt under section 548(d).

The definition of "value" under 11 U.S.C. § 548(d) includes the "satisfaction of an antecedent debt." A reduction in debt is sufficient to establish equivalent value. *See In re Wilkinson*, 196 Fed. Appx. at 341.

Baker's initial investment of $1,571,032.00 did not create an antecedent debt owed to Baker by the Debtor as of December 8, 2005. Baker's initial investment in 2003 was a payment towards rental fees, stallion service fees, insurance fees, and boarding fees, as set forth in the Mare Lease Agreements, all of which were consideration for a lease period that terminated in July of 2004 and a boarding agreement that terminated in December of 2004. By the time Baker began negotiations with the Debtor for a conversion of these interests in November of 2004, Baker already received the bulk of what was promised to him in exchange for his investment, particularly in light of the fact the Mare Lease Agreements never guaranteed foals as a result.

What is unclear, though, from the record is whether an antecedent debt could have been created by the value of the foals produced as a result of those pairings that have been retained by the Debtor. Concluding that the conversion of Baker's mare lease interests never formally occurred means Baker retained his interest in the Mare Lease Program. As of December 2005, that interest could have only been in foals produced by the pairings, if any, as the Mare Lease

Agreements contemplate a 2004 breeding season with the production of foals in 2005. If foals were produced by the pairings, and the Debtor never transferred those foals to Baker as their rightful owner, then an antecedent debt may have been created.

But the record has no evidence that foals were ever born as a result of these pairings or the value of these foals if born. Only two documents introduced into evidence appear to address the possible foals produced and neither sufficiently establish their existence. The February 21, 2005 letter to Baker from the Debtor requesting Baker's permission to perform minor corrective surgery and providing Baker with a Foal Surgery Authorization Form does not indicate any foals were actually born as a result of the pairings. Moreover, the August 14, 2007 IRS Investigation Report fails to establish the birth of any live foals as a result of the pairings. In the report, the IRS attempts to assign a value to foals that may have been produced by the mare lease pairings, but the IRS is unable to definitively conclude in many instances whether the foals were a result of the pairings. The report also states that Baker had only received information relating to the birth of one foal (which is unnamed in the report) and was unaware if any other foals were produced from the selected pairs of horses or if foals were produced, whether they were sold. Such conflicting evidence does not convince the Court of the existence of the foals or their value.

Based on the evidence before the Court, there was no conversion of Baker's mare lease interests nor any evidence that foals were ever born from the pairings. The evidence shows that on December 28, 2005, Baker received the benefit of the payoff of his Key Bank Loan, whereas the Debtor received nothing of value from Baker in return. A payoff of $801,558.70 in exchange for nothing is not reasonably equivalent value. Thus, the Trustee has met his burden of proof in showing the Debtor received less than reasonably equivalent value in return for the payment of $801,558.70.

**(3)     Insolvency**

Paul Vidas, the Trustee's insolvency expert, testified that the Debtor was insolvent at the date of the transfer by an amount in excess of stated liabilities of $168,590,919.30 and the Debtor was insolvent at the date of the transfer by an amount in excess of stated and unstated liabilities of $289,459,028.60.  Mr. Vidas therefore concluded the Debtor was insolvent within the meaning of the federal bankruptcy law and K.R.S. § 355.1-201(23).

The Defendant did not rebut the expert testimony of Mr. Vidas.  Thus, the Trustee has met his burden of proving that the Debtor was insolvent on the date of the Transfer.

**B.     11 U.S.C. § 550(a)**

Based on the foregoing, the Trustee has met his burden of proof and is entitled to avoid the transfer on December 8, 2005, under section 548(a)(1)(B).  To the extent a transfer is avoided under section 548 of the Bankruptcy Code, section 550(a) of the Bankruptcy Code allows a trustee to recover, for the benefit of the estate, the value of such property transferred from the entity for whose benefit the transfer was made. 11 U.S.C. § 550(a)(1).

Pursuant to the Order dated August 24, 2010 [Doc. 67], the Court adopted the holding in *In re International Administrative Services, Inc.*, 408 F.3d 689 (11th Cir. 2005), and held the Trustee can recover the value of the $801,558.70 transfer to Key Bank from Baker directly, if he received the benefit of the transfer.

Under section 550 of the Bankruptcy Code, "once a trustee proves that a transfer is avoidable ... he may seek to recover against any transferee, initial or immediate, or an entity for whose benefit the transfer is made." *In re Richmond Produce Co., Inc. v. Sorani*, 195 B.R. 455, 463 (N.D. Cal. 1996).  The evidence shows that Baker, who owed a debt to Key Bank, received the benefit of the transfer in the payoff of that debt.  Because the Trustee is entitled to avoid the transfer under section 548, the Trustee is entitled to recover $801,558.70 from Baker who

11

received the benefit of that transfer.

## Conclusion

The Trustee has met his burden of proof on all elements of 11 U.S.C. § 548(a)(1)(B) and is entitled to avoid the transfer made to Key Bank on December 8, 2005 and recover from Baker the value of the transfer in the amount of $801,558.70 pursuant to 11 U.S.C. § 550(a).  The Court shall determine whether the Trustee is entitled to pre- and post judgment interest, plus costs and reasonable attorneys' fees incurred by the Trustee in connection with the investigation and prosecution of the instant action, by separate order.

The Court shall enter a separate Judgment consistent herewith.

Copies to:

Alisa E. Moen, Esq.

Jana S. White, Esq.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
*The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.*



**Signed By:**
*Joseph M. Scott, Jr.*
**Bankruptcy Judge
Dated: Monday, March 14, 2011
(jms)**